**Ernie DE LA FUENTE, On Behalf of Himself And All Others Similarly Situated, Plaintiff,**

v.

**DCI TELECOMMUNICATIONS, INC., Joseph J. Murphy, Russell B. Hintz, Larry Shatsoff, John Adams, Schnitzer & Kondub, P.C., Richard S. Kondub, and Ross J. Schnitzer, Defendants.**

No. 01 CIV. 3365(CM).

United States District Court, S.D. New York.

March 4, 2003.

AMENDED MEMORANDUM DECISION AND ORDER PROVIDING FINDINGS REQUIRED BY THE PSLRA, GRANTING DEFENDANTS' REQUEST FOR SANCTIONS AND DENYING PLAINTIFF'S REQUEST FOR SANCTIONS

McMAHON, District Judge.

On September 6, 2002, Defendants DCI Telecommunications, Inc. ("DCI"), Joseph J. Murphy, Russell B. Hintz, Larry Shatsoff, and John Adams (collectively "DCI Defendants") moved pursuant to Fed. R.Civ.P. 60(b) to reopen this case for findings regarding compliance by the parties and their attorneys with Fed R. Civ. P. 11(b). These findings are required under Section 21D(c) of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4 upon final adjudication of any action arising under the Act. The DCI Defendants argue in their accompanying motion that plaintiff[1] and plaintiff's counsel violated Rule 11 in bringing the action, and they seek sanctions in the full amount of attorneys fees and costs for defending the action. On September 20, 2002, plaintiff submitted an opposition to the DCI Defendants' motion, requesting that the court deny the motion and award attorney's fees and costs of $2,000 to plaintiff's counsel for responding to the motion. DCI Defendants . submitted their reply memorandum on October 1, 2002. On October 7, 2002, counsel for defendants Schnitzer & Kondub, P.C., Richard S. Kondub and Ross J. Schnitzer (collectively, "S & K Defendants") joined and adopted the motion of the DCI Defendants.

For the reasons stated below, I conclude that PSLRA sanctions are appropriately assessed against plaintiff's counsel. I deny plaintiff's cross-motion for sanctions against defendants for filing the instant motion.

---

1. DCI Defendants seek sanctions against "plaintiff and plaintiff's counsel." On July 13, 2001, I appointed "The de la Fuente Group" (consisting of investors Bradley R. Gramm, Lee C. lead counsel.) The law firms of Dreier Baritz & Federman (now named Federman & Sherwood) and Holtzer & Holtzer were appointed co-lead counsel and the law firm of Wolf Haldenstein Adler Freeman & Hertz LLP was appointed liason counsel. Thus, although DCI Defendants use the article "his" in referring to plaintiff, I assume that this is simply a grammatical error, and that the defendants seek sanctions against plaintiff "The de la Fuente Group" and not one of the individuals named in the group. Furthermore, defendants have not specified which firms they seek sanctions against. As I conclude that sanctions are appropriate, it is necessary for plaintiff's counsel to submit information regarding their involvement in the case, so that the burden of sanctions can be appropriately divided among them.

## BACKGROUND

The Court's decision of April 23, 2002, *De La Fuente v. DCI Telecommunications Inc.*, 206 F.R.D. 369 (S.D.N.Y.2002), provides a detailed description of plaintiff's claims, and that decision should be referred to for context. The facts essential to this motion, however, are repeated here.

DCI Telecommunications, Inc., ("DCI") is a Colorado corporation headquartered in Stratford, Connecticut. Plaintiff, the de la Fuente Group, is comprised of three named investors in DCI, who brought this action on April 21, 2001 on behalf of themselves and all other DCI stockholders similarly situated. Plaintiff alleged fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiff's original complaint alleged securities fraud based upon accounting irregularities with respect to ten corporate transactions that occurred between 1995 and 1999. Plaintiff argued that DCI's financial statements were materially misleading because they failed to account for a number of transactions according to generally accepted accounting principles (GAAP), thereby overstating assets and revenues.

On August 6, 2001, plaintiff filed an amended complaint. Plaintiff's amended complaint repeated the allegations of fraudulent accounting practices, and included additional allegations of fraud. Although the additional allegations were made against "defendants" generally, none of these allegations implicated the S & K Defendants or stated a claim against them. Plaintiff's amended complaint also included changes to the class period and named additional individual defendants in the Section 20(a) claims.

Plaintiff filed a motion seeking to be appointed lead plaintiff on June 25, 2001, and its counsel moved to be appointed lead plaintiffs' counsel. Defendants opposed this motion. I granted the motion on July 13, 2001.

DCI Defendants moved to dismiss the claims against them on September 10, 2001 and S & K Defendants moved to dismiss the claims against them on September 13, 2001. Both motions sought dismissal on the grounds that the statute of limitations for plaintiff's claims had expired. Additionally, DCI Defendants claimed that plaintiff did not adequately allege scienter. In their reply memorandum in support of the motion to dismiss, DCI Defendants acknowledged that one of the claims in plaintiff's amended complaint, which related to the failure of DCI to distribute shares that DCI had acquired of Corzon, Inc. (the "Corzon Claim") was timely. (DCI Defendant's Reply in Support of their Motion to Dismiss, p. 2.) DCI Defendants stated their intention to file a motion for summary judgment to dismiss the Corzon Claim if plaintiff did not withdraw the claim. The Corzon claim did not apply to the S & K Defendants.[2]

---

2. The Corzon claim related to a transaction in which DCI sold an asset to Corzon, Inc. (at that time called Tanners Restaurant Group, Inc.) in exchange for 40,000,000 shares of stock and an assumption by Corzon of $3,453,652 of DCI debt. In its November 27, 2000 Form 8–K, DCI declared a one-time stock dividend, whereby one share of Corzon would be given to DCI shareholders for each share of DCI that they owned as of December 6, 2000. DCI announced in January 2001 that it was unable to distribute these shares, and it appears that the stocks have not been issued to date. Plaintiff claimed that DCI, while stating that it could not distribute the shares to investors, was simultaneously selling the shares for its own benefit.

Plaintiff opposed the motions for dismissal and defendants replied. In addition, while the motions to dismiss were still pending, the parties made and responded to additional motions. On October 29, 2001, plaintiff moved to certify the class action, seeking to name the members of the de la Fuente Group as class representatives. Defendants opposed this motion.

On January 3, 2002, DCI Defendants moved for partial summary judgment on the Corzon Claim, as they had stated that they would in their reply motion. Plaintiff opposed the motion for summary judgment with an affidavit pursuant to Fed.R.Civ.P. 56(f) and asked for discovery on the merits of the Corzon Claim.[3]

On April 23, 2002, this Court issued a decision and order ("the April 2002 Decision"), addressing all outstanding motions. All claims against S & K Defendants were dismissed as time barred. All claims against DCI Defendants except the Corzon Claim were also dismissed as time barred. I concluded that plaintiff adequately pleaded scienter in connection with the Corzon Claim and denied defendants' request for dismissal on that ground. I deferred decision on the motion for partial summary judgment to allow plaintiff to conduct discovery regarding the basis of the Corzon Claim. Plaintiff's motion for class certification was granted, but only as to the Corzon Claim.

In the three months following the decision, the parties continued to dispute the viability of the remaining claim. After plaintiff served a document request on DCI Defendants on May 3, 2002, DCI counsel told plaintiff's counsel that there were no relevant documents that had not already been produced to plaintiff. (September 6, 2002 Declaration of Robert A. Horowitz ("Horowitz Aff.") ¶ 20.) On May 8, 2002, plaintiff made a settlement offer that was rejected by DCI Defendants the following day. (Letter from DCI Counsel to Plaintiff's Counsel, May 9, 2002, Ex. O to Horowitz Aff.)

On July 19, 2002, DCI Defendants renewed their motion for summary judgment, relying on the papers already filed. Three weeks later, on August 13, 2002, plaintiff moved to dismiss its remaining claim, with prejudice, and filed a response to the motion for summary judgment stating that it was moot in light of its cross-motion to dismiss. I granted plaintiff's motion to dismiss the complaint with prejudice on August 22, 2002, and the case was closed. The clerk entered judgment on August 23, 2002.

On September 9, 2002, the DCI Defendants moved to reopen the case for the purpose of making findings regarding compliance with Rule 11, as required by the PSLRA, and imposing sanctions of attorneys' fees and costs. On September 23, Plaintiff cross-moved for sanctions against defendant for filing their September 9th motion. S & K Defendants sent a letter to the court on October 7 joining and adopting the motion of the DCI Defendants.

## DISCUSSION

### I. Legal Standards

#### A. The Private Securities Litigation Reform Act Requirements

In 1995, in an effort to curb the perceived abuses in securities litigation, the United States Congress enacted the Pri-

---

3. Fed.R.Civ.P. 56(f) states: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

vate Securities Litigation Reform Act of 1995 ("PSLRA"). The provision of the PSLRA at issue in this motion, which is Section 21D(c) of the Securities Exchange Act of 1934, requires courts, at the conclusion of all private actions arising under the Exchange Act, to make specific findings as to the compliance by all parties and attorneys with Fed.R.Civ.P. 11(b) ("Rule 11(b)"). *See* 15 U.S.C. § 78u–4(c)(1); *see generally Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166–67 (2d Cir.1999)(discussing the PSLRA and Rule 11). If the court finds that Rule 11(b) has been violated, the court is required to impose sanctions upon the offending party or attorney. *Id.* The PSLRA provides a rebuttable presumption that a substantial failure of a complaint to comply with any requirement of Rule 11(b) is to award the opposing party reasonable attorney's fees and other expenses incurred in the action. 15 U.S.C. § 78u–4(c)(3)(A)(ii). The presumption can be rebutted by proof that the violation of Rule 11(b) was de minimis or proof that the award would impose an unreasonable burden on the party or attorney it is imposed upon and would be unjust, and that failure to make the award would not impose a greater burden on the party in whose favor sanctions are to be imposed. 15 U.S.C. § 78u–4(c)(3)(B)

■ The requirement that courts make findings regarding compliance with Rule 11(b) was intended to put "teeth" in Rule 11. H.R. Conf. Rep. No. 104–369 (1995), reprinted in 1995 U.S.C.C.A.N. 730. *cited in DeBartolo*, 186 F.3d at 167. The PSLRA does not alter the substantive standards for finding a Rule 11 violation, but makes the review by the court and the sanctioning of violators mandatory rather than discretionary, and creates presumptions regarding sanctions. *Id.*

## B. Rule 11(b) Requirements

Rule 11 (b) of the Federal Rules of Civil Procedure provides that:

> By presenting to the court…a pleading, written motion, or other paper, an attorney…is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

DCI Defendants assert that plaintiff and plaintiff's counsel violated each of the provisions of Rule 11(b). (Defendant's Memo., p. 18–21.)

## C. Jurisdictional Basis

Before addressing the merits, I respond to a procedural attack mounted by plaintiff. Defendants move pursuant to Fed. R.Civ.P. 60(b) ("Rule 60(b)") to reopen the case to include findings required by the PSLRA. Plaintiff responds that this motion is improper and affords no basis to impose PSLRA sanctions, because defendants are actually seeking to amend the judgment, rather than seeking relief from

it. Plaintiff contends that the proper procedural device for defendants would have been Fed.R.Civ.P. 59 ("Rule 59"), which provides for amendment to judgments. But the deadline to move under Rule 59 (which is ten days) had long since passed when DCI defendants filed their motion. Plaintiff argues that defendants cannot move under Rule 59 and have no basis to move under Rule 60, and concludes that the motion must be denied. Indeed, as far as plaintiff is concerned, "the Court's inquiry can end here."

Plaintiff is in error. I am perfectly free to address the motion on the merits.

Plaintiff is correct that defendants could have moved pursuant to Rule 59(e) to alter or amend the court's judgment to include findings and impose sanctions under Rule 11. Indeed, the Court is aware of a case in this district where a decision was amended under Rule 59(e) to include Rule 11 sanctions. *See Richter v. Achs*, 174 F.R.D. 316 (S.D.N.Y.1997)(party moved under Rule 59(e) to amend judgment to impose Rule 11 sanctions, court noted that it had not made the findings required by the PSLRA and did so); *see also DeMarco v. Depotech Corp.*, 131 F.Supp.2d 1185 (S.D.Cal.2001)(court considered motion to amend judgment under Rule 59(e) to amend judgment to impose Rule 11 sanctions, court noted that it had not made the

findings required by the PSLRA and did so). Plaintiff is also correct that by the time defendants moved it was too late to invoke Rule 59.

■ However, I am aware of no authority stating that a party must invoke Rule 59, or any other procedural rule, to ask for Rule 11 findings at the conclusion of a securities litigation. The Supreme Court has specifically recognized the power of a district court to impose Rule 11 sanctions after a case has been dismissed—even where, as in the instant case, the plaintiff voluntarily sought dismissal. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).[4] The Court recognized that "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending...[l]ike the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action...Such a determination may be made after the principal suit has been terminated." *Id* at 395–96, 110 S.Ct. 2447. The Court's interpretation of Rule 11 was guided by the statutory purpose of the rule-deterring abuses of the judicial system. *Id* at 397, 110 S.Ct. 2447. The Court rejected the petitioner's claim that the district court had no jurisdiction to issue Rule 11 findings after the voluntary

---

4. The rule established by *Cooter & Gell* was partially superceded by the amendment of Rule 11 in 1993 to include a "safe harbor" provision. This safe harbor provision requires that a party seeking Rule 11 sanctions wait 21 days from the service of their motion before filing it with the court, in order to give the party the opportunity to withdraw or appropriately correct the challenged paper, claim, defense, contention, allegation, or denial. Fed.R.Civ.P. 11(c)(1)(A). Thus, a court can no longer issue Rule 11 sanctions in a case where, as in *Cooter & Gell*, a complaint was voluntarily dismissed within 21 days of a request for Rule 11 sanctions. *Photocircuits*

*Corp. v. Marathon Agents, Inc.*, 162 F.R.D. 449, 452 (E.D.N.Y.1995). The PSLRA, however, requires that the district court determine compliance with Rule 11(b), and does not incorporate the safe harbor provision contained in Rule 11(c). The aspects of the *Cooter & Gell* holding that are relevant to the instant case were not altered by the safe harbor amendment. *See generally Inter–County Resources, Inc. v. Medical Resources, Inc.* 49 F.Supp.2d 682, 684 (citing *Cooter & Gell* in 1999 for the proposition that a court can hear a Rule 11 sanctions motion in a securities litigation case after dismissal).

dismissal of the case. *Id* at 398, 110 S.Ct. 2447.

■ Following *Cooter & Gell*, this Court has previously rejected the contention of a party in a securities litigation that the Court lacked jurisdiction to impose PSLRA sanctions after the case had been dismissed. *Inter–County Resources, Inc. v. Medical Resources, Inc.*, 49 F.Supp.2d 682, 684 (S.D.N.Y.1999). In *Inter–County Resources,* Judge Rakoff dismissed a securities litigation case and then, at defendant's request, conducted a review of the record as mandated by the PSLRA. *Id* at 683. Plaintiff's counsel opposed, claiming that the Court lacked jurisdiction to impose sanctions after a case is dismissed. *Id* at 684. Judge Rakoff, citing *Cooter & Gell,* held that a "court's power to impose sanctions on litigants for violations of the applicable rules does not terminate upon the dismissal of the case." *Id.*

Therefore, this Court's inquiry does not end—or even start—with an analysis of the propriety of invoking Rule 60 as opposed to Rule 59.

With that out of the way, I turn to the merits.

## II. Rule 11 Compliance

### A. Plaintiff's Allegations

Plaintiff's original complaint was filed on April 21, 2001. Ten months earlier, on June 23, 2000, the Securities and Exchange Commission had filed an action against DCI Telecommunications Inc., Joseph J. Murphy, and Russell B. Hintz. The SEC accused these parties of accounting fraud in violation of various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The ten instances of accounting impropriety mentioned in plaintiff's original complaint are identical to the ones that undergird the SEC action: both accuse DCI of "cooking its books" by improperly accounting for various acquisitions and grossly overvaluing a certain contract and a certain promissory note. (Plaintiff's Original Complaint, ¶ 2; SEC Complaint, ¶ 1.) The events pleaded took place between 1995 and 1999.

Of course, a private plaintiff, unlike the SEC, is subject to a statute of limitations that barred their recovery on any of the allegedly fraudulent actions in their account. Under *Lampf, Pleva Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), an action is time barred if *either* (1) the events occurred more than three years prior to filing of the complaint; or (2) the plaintiff had inquiry notice of the alleged fraud for more than one year.[5] On their face, all ten of the events pleaded in the

---

**5.** The statute of limitations established by *Lampf* has been changed by the Sarbanes–Oxley Act of 2002 (Pub.L.107–204). Section 804 of the Act amends 28 U.S.C.A. 1658 to hold that "…a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.". Pub.L. 107–204, 804(b). Congress further provided that "The limitations period…shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002]." Pub.L. 107–204, 804(b), July 30, 2002, 116 Stat. 801.

As the decision in this case was issued on April 23, 2002, it was decided in accordance with *Lampf,* which was the well-settled law at that time. More importantly, plaintiff's complaint was filed on April 21, 2001, and the new statute of limitations provided by the Sarbanes–Oxley Act would not have applied to plaintiff's complaint even if the motion to dismiss was decided after the complaint was enacted. Congress's intent is clear the statute of limitations established by the Sarbanes–

original complaint failed under at least one prong of *Lampf,* and most failed under both prongs. Defendants claim that they informed plaintiff of the applicable statute of limitations and asked plaintiff to withdraw the complaint.

Instead, plaintiff filed an amended complaint, repeating the original claims and adding three additional allegations of fraudulent transactions. Two of the three new transactions clearly failed under the first prong of *Lampf* as they had occurred well over three years before the filing of the complaint. The third—the Corzon Claim—concerned events that had occurred only a few months prior to the filing of the claim.

Both plaintiff's original complaint and the amended complaint assert two broad claims for relief—one for violations of Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b) and SEC Rule 10b–5 promulgated pursuant thereto, and one for violations of Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a)—buttressed by hundreds of discrete factual allegations. In the April 2002 decision, I divided plaintiff's blunderbuss allegations into thirteen specific claims—the ten original accounting fraud allegations and three additional allegations of fraud presented for the first time in the amended complaint.[6] I found that seven of the accounting claims and two of the additional fraud claims occurred at least four years—and in some cases over six years before plaintiff filed the complaint, which meant they were clearly time-barred under the first prong of *Lampf.* For the

three remaining accounting claims, I found that the plaintiff had inquiry notice for at least two years before filing the complaint, which meant they were clearly time-barred under the second prong of *Lampf.* Thus, twelve of plaintiff's thirteen claims were dismissed on statute of limitations grounds.

As noted above, the remaining claim was dismissed with prejudice, upon motion by the plaintiff, and judgment was entered on August 23, 2003.

## B. Application of Rule 11(b)

Defendants advance five arguments for why Rule 11(b) sanctions are warranted. I find that four of these arguments are unpersuasive. However, I agree with defendant that plaintiff substantially violated Rule 11(b)(2) by arguing in opposition to defendant's motion to dismiss that the claims should not be dismissed on statute of limitations grounds.

### 1. *Plaintiff Had No Evidentiary Support to Bring Its Claims.*

■ First, defendants argue that plaintiff's original complaint was filed without conducting investigation "reasonable under the circumstances." Defendants contend that the original complaint simply copies the SEC complaint. They further contend that plaintiff also brought the Corzon Claim "based only on the word of the SEC." Presumably, defendants mean to argue that this violates Rule 11(b)(3), which requires that allegations "have evidentiary support or, if specifically so identified, are likely to have evidentiary sup-

---

Oxley Act applies only to proceedings commenced on or after July 30, 2002.

Finally, I note that even under the extended statute of limitations provided by the Sarbanes–Oxley Act, the majority of plaintiff's claims would still be time barred.

**6.** In DCI Defendant's memorandum in support of the instant motion, they discuss the ten accounting fraud claims and four addi-

tional frauds that they believe were contained in the amended complaint. Consistent with the April 2002 decision, I continue to read plaintiff's amended complaint to create thirteen claims. I note that, were I to read the amended complaint as creating fourteen claims, it would not change the reasoning or outcome of this decision.

port after a reasonable opportunity for further investigation or discovery."

Plaintiff responds by asserting that plaintiff's counsel conducted a comprehensive factual investigation before filing the lawsuit. (Plaintiff's Opp., p. 2–8). The general materials that plaintiff's counsel reviewed and analyzed are listed in the memorandum, and there are two affidavits, attached as exhibits, from plaintiff's attorneys which describe their investigation. (Affidavit of Corey D. Holzer ( "Holzer Aff."), Ex. A to Plaintiff's Opp. and Affidavit of Wiliam B. Federman ("Federman Aff."), Ex. H to Plaintiff's Opp.) Both attorneys state in their affidavits that the defendants never inquired into the extent that plaintiff and plaintiff's counsel investigated the case. Plaintiff claims that their investigation provided ample support for their claims.

Plaintiff concedes that his counsel viewed and utilized SEC information and the SEC complaints as part of that factual investigation, but asserts that there is nothing improper about utilizing the SEC filings. Plaintiff further states that every allegation in the complaint was verified by plaintiff's counsel through independent investigation.

I agree with plaintiff that there is nothing improper about utilizing information from the SEC as evidence to support private claims. Indeed, as plaintiff notes "it would have been irresponsible for plaintiff to have ignored the SEC's highly relevant allegations and findings." (Plaintiff's Opp., p. 4.) The striking similarity between the SEC's allegations and plaintiff's allegations does not demonstrate that plaintiff lacked evidentiary support. Rather, the SEC allegations provided plaintiff with evidentiary support. The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more "evi-

dentiary support" than one based on rumor and innuendo gleaned from "Heard on the Street."

Having made this observation, it is unnecessary for me to go on and make findings on the adequacy of the independent verification efforts chronicled in counsel's affidavits insofar as they address the twelve time-barred claims. This is because I dispose of the motion as to those claims on other grounds. I defer discussion of the Corzon Claim until later in this opinion.

2. *Improper Purpose*

▉ Defendants contend that plaintiff did not bring the lawsuit for a proper purpose, but as a strike suit to pressure defendants into a quick settlement. If true, this would violate Rule 11(b)(1), under which it is sanctionable to present a claim "for any improper purpose." Defendants support their assertion by alleging that plaintiff's counsel inquired into the amount of insurance DCI carried, and commented that DCI must have money because the company had hired defendants' law firm to represent them.

Assuming *arguendo* that plaintiff's counsel did make these statements, the statements do not prove that plaintiff brought the lawsuit as a strike suit. Attempting to settle a case can be a wise strategic decision, and does not alone imply that the suit was filed only to force a settlement. Inquiries into money available to one's opponent, and even provocative statements about what money must be available, can be a normal part of the settlement process.

Defendants also point out that plaintiff refused to withdraw his claim, even after "DCI Defendants' counsel confronted Plaintiff with the lack of merit in his claims," until the "bitter end," when it became clear that DCI Defendants would not agree to a monetary settlement. But it is quite normal for litigants to decline to

withdraw their claims despite their adversaries' strenuous argument of lack of merit.

On the other hand, plaintiff's eventual decision to discontinue prosecution of the Corzon Claim in the face of a dispositive motion is the most damning piece of evidence of improper motive. This court had already opined that defendants' arguments in favor of summary disposition were strong, and plaintiff's behavior fairly suggests that the case was abandoned once it became clear that defendants would not settle a claim they were bound to win.

However, at the time he made the motion, plaintiff's counsel averred that it would cost more to pursue a lone claim, on behalf of a very small class, than the potential recovery would warrant. Of course, class counsel would be entitled to attorneys' fees—fees not limited by the amount of the recovery—if the class won anything at all. And settlements in securities fraud cases have been known to reap more for the lawyers than for the class members. So to find against him, I would have to call him a liar, which I am loath to do, especially since, by withdrawing the claim, plaintiff has managed to conserve considerable resources of both defendants and the court. I decline to find a Rule 11(b) violation on this ground.

3. *The Arguments Made in Opposition to the Statute of Limitations Motion Were Not Warranted by Law or by Nonfrivolous Argument for Establishment of New Law*

■ The most serious argument in support of defendants' motion for sanctions is that plaintiff's legal arguments in opposition to the motion to dismiss on statute of limitations grounds were not warranted by existing law or by a nonfrivolous argument for the establishment of new law. If true, this would violate Rule 11(b)(2).

As discussed previously, under the Supreme Court's holding in *Lampf,* securities actions will be time barred if either 1) the event at issue occurred more than three years previously or 2) the plaintiff had inquiry notice of the alleged fraud for more than one year. Defendants argue that plaintiffs knew that their actions were clearly time barred, but filed them anyway and refused to dismiss them even when defendants' lawyers advised plaintiff's counsel that they would raise the statute of limitations during a call between counsel shortly after the complaint was filed and during the initial pretrial conference. (Memorandum in Support of their Motion to Reopen the Case ("Defendants' Memo.") at 6.) Plaintiff concedes awareness of the *Lampf* rule.[7] Indeed, plaintiffs concede that they defined the class period so that it went back three years and no more to comply with the three-year statute of limitations.

So the question I must resolve is this: did plaintiff craft frivolous arguments to try to get around the time bar—arguments that did not fairly warrant a ruling in its favor, given existing law?

Defendants note that, when the motion to dismiss was briefed, plaintiff did not even try to counter defendants' factual ar-

---

7. The concession is nice, but irrelevant, since actual knowledge is not required. A securities fraud plaintiff is charged with such knowledge of the applicable limitations period. As the Second Circuit noted in *Simon DeBartolo Group,* Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty head pure-heart' justification for patently frivolous arguments." *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 166 (2d Cir.1999) *citing* Fed.R.Civ.P. 11 advisory committee note to 1993 amendments.

gument that the majority of the events giving rise to the claims had occurred more than three years before plaintiffs brought suit. (Defendants' Memo. at 11.) But there was no factual basis for such an argument, so it would have been frivolous for plaintiff to make it.

This does not mean that plaintiff conceded the statute of limitations point. On the contrary, the de la Fuente Group opposed the motion, arguing that dismissal was inappropriate for four reasons: (1) inquiry notice—that is, the second prong of the *Lampf* rule—involves a factual determination, which precludes dismissal as a matter of law, (2) the continuing fraud doctrine (also referred to as the continuing wrong doctrine) prevented the application of the statute of limitations because the Corzon Claim was timely and all of the alleged fraudulent transactions were therefore timely as part of a continuing wrong, (3) dismissal would run afoul of the policy behind the PSLRA, and (4) the claims were timely under the doctrine of equitable tolling. I rejected each of these arguments.

▆▆▆ But that does not dispose of this motion either. Claims are not frivolous simply because they were dismissed. *See e.g., Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 166 (2d Cir.1999)(overturning the district courts imposition of Rule 11 sanctions on a 10b–5 claim that was dismissed, while upholding sanctions on a dismissed 10b–13 claim); *Kalnit v. Eichler,* 99 F.Supp.2d 327 (S.D.N.Y.2000)(dismissing complaint but holding that, although the allegations were without merit, it did not follow that plaintiff's attempts to state a claim were unreasonable and had absolutely no chance of success). The Second Circuit has held that "an argument constitutes a frivolous legal position for the purposes of Rule 11 sanctions, if, under the objective standard

of reasonableness, it is clear . . . that there is no chance of success and no reasonable argument to extend, modify, or reverse the law as it stands." *Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d. Cir.1995) *quoting Caisse Nationale de Credit Agricole–CNCA v. Valcorp, Inc.,* 28 F.3d 259, 264 (2d. Cir.1994). Accordingly, courts in the Second Circuit have found sanctions appropriate in cases where a plaintiff files a claim that is clearly deficient and where he advances no plausible argument in favor of validity. *See e.g., Burekovitch v. Hertz,* 2001 WL 984942, *13 (E.D.N.Y.2001)(finding a violation of Rule 11(b)(2) when plaintiff filed a complaint that was clearly barred by a legislative act and then, when he was informed that his claim had no merit, refused to either withdraw it or provide the Court with any reason why the law should be modified or extended to cover his claim); *Inter–County Resources, Inc. v. Medical Resources, Inc.,* 49 F.Supp.2d 682, 684 (S.D.N.Y.1999)(finding a violation of Rule 11(b)(2) when plaintiff had no standing, under a well-established rule, to file a securities claim and where the theories for standing that plaintiff developed in response to the Rule 11 review had no legal or factual support).

Two of plaintiff's four arguments are clearly frivolous under the *Credit Agricole–Morley* standard.

First, it cannot possibly violate the policy behind the PSLRA to dismiss a time-barred claim. To the contrary: the PSLRA was passed to discourage the commencement of frivolous securities fraud actions. That is why the law mandates sanctions when frivolous claims are filed. *See* H.R. Conf. Rep. 104–369 (explaining that the PSLRA reforms are intended to strengthen the application of Rule 11 in order to "reduce significantly the filing of meritless lawsuits without hindering the ability of victims of fraud to pursue valid

claims and noting that Congress was prompted to act by "significant evidence of abuse in private securities lawsuits"). Bringing an obviously time-barred complaint can itself be frivolous.[8] Thus, the policy behind the PSLRA would appear to favor, not just dismissal of the stale claims, but sanctions for bringing them in the first place.

Recognizing that the PSLRA was not intended to benefit the plaintiff's securities bar, plaintiff argues that the statute's purpose would nonetheless be undermined if plaintiff was held to the statute of limitations, because otherwise plaintiff might not be able to comply with that law's heightened pleading requirements. By any objectively reasonable standard, this is an argument plaintiff had absolutely no chance of winning. As I noted in the April 2002 opinion, Congress did not purport to overrule *Lampf,* or to extend the statute of limitations, when it imposed heightened pleading requirements in securities fraud lawsuits. It sought only to forestall lawsuits that had no basis in fact by imposing heightened pleading requirements. The

statute of limitations has nothing to do with the underlying facts. It imposes a procedural barrier to suit—even to suit on a claim that would have merit as a matter of fact, had it been timely brought. When a claim is stale, it may not be maintained, whether or not it is otherwise meritorious.

Second, plaintiff's invocation of equitable tolling to oppose the motion to dismiss was similarly frivolous. As I indicated in the April 2002 opinion, the Supreme Court rejected that precise argument in *Lampf,* holding specifically that the doctrine of equitable tolling does not apply to the statute of limitations in securities fraud cases. *De La Fuente,* 206 F.R.D. at 386; *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773. The law on the point had been settled for a decade when the complaint was filed. *Rothman v. Gregor,* 220 F.3d 81 (2d Cir. 2000); *Friedman v. Wheat First Securities Inc.,* 64 F.Supp.2d 338 (S.D.N.Y.1999); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 778 F.Supp. 695 (S.D.N.Y. 1991). So plaintiff had no objectively reasonable prospect of prevailing on that theory, either.[9]

---

**8.** *See Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281 (2d Cir.1986)(finding that Rule 11 had been violated because plaintiff's claims were time barred, and had no chance of success under existing precedents and no reasonable argument had been advanced to extend, modify, or reverse the law, and remanding to district court to exercise its discretion in fashioning sanctions); *Brubaker v. City of Richmond,* 943 F.2d 1363 (4th Cir.1991)(upholding district court's imposition of sanctions on a claim that was clearly time barred, when plaintiffs had been told it was time barred and were not attempting to reverse existing precedent); *But see, De Carlo v. Ratner,* 204 F.Supp.2d 630 (S.D.N.Y.2002)(finding that plaintiff's conduct in pursuing an action that was time barred did not "rise to the level of meriting sanctions" under Rule 11, even though plaintiff had persisted in pursuing case even after the court had warned plaintiff that his case appeared to be time barred); *Wilkinson v. New York Telephone Co.,* 1995

WL 87257 (E.D.N.Y.1995)(holding that although plaintiff's action was time barred it was not frivolous, vexatious, or meant to harass defendant, so Rule 11 sanctions were inappropriate).

**9.** In its papers opposing the instant motion, Plaintiff advances an additional argument for why its equitable tolling claim should be considered non-frivolous. It argues that equitable tolling is appropriate based on "today's scandalous climate in corporate America." This theory was not advanced in the original complaint or argued in the original motion to dismiss, so it is not properly considered on this motion. Furthermore, plaintiff's argument that Congress changed the statute of limitations in the Sarbanes–Oxley Act of 2002 does not support his claim regarding equitable tolling. The Sarbanes–Oxley Act does not change the law regarding equitable tolling—it keeps the same structure of the rule established in *Lampf,* while simply extending the

Arguments three and four require more extended discussion.

Third, plaintiff argued that it was improper to dismiss claims on a pre-answer motion when their timeliness involved the issue of inquiry notice. Plaintiff applied this argument to all twelve of the dismissed claims: he urged that all of his claims were timely, because the statute of limitation started to run only after the date the SEC action was filed, at which point plaintiff had enough information to meet the heightened pleading requirements of the PSLRA.

As to the nine claims that were dismissed under the first prong of *Lampf*— because the events in question occurred more than three years prior to the filing of the complaint (and in some cases occurred as many as six years before the filing of the complaint)—plaintiff's argument had no objectively reasonable chance of success. The inquiry notice prong of *Lampf's* statute of limitations applies to bar claims of which plaintiff had inquiry notice for more than a year, even if the events in question took place less than three years earlier. It does not extend, but rather shortens, the presumptive statute of limitations. The argument, to the extent of 75% of the dismissed claims, is frivolous.

As to the three claims that were dismissed on inquiry notice grounds: in response to the motion to dismiss, plaintiff advanced a number of arguments as to why the class members did not have inquiry notice. He disputed the sufficiency of the so-called "storm warnings," claimed that defendants had engaged in fraudulent concealment; and claimed that certain reassuring statements in the public record negated the inquiry notice.

In the April 2002 decision, I discussed plaintiff's arguments fully.[10] I concluded, after reviewing the complaint and the associated public disclosures, that plaintiff, with reasonable diligence, should have discovered the alleged frauds underlying the three claims more than a year prior to the filing of the complaint. But while I was not persuaded by any of plaintiff's arguments, I cannot conclude that they were frivolous in the same way the arguments discussed above were frivolous. *Richter v. Achs*, 174 F.R.D. 316, 319 (S.D.N.Y.1997)(denying defendant's request for Rule 11 sanctions on a 10b–5 claim that was dismissed on summary judgment, and concluding that "[t]hough plaintiff's arguments were unconvincing, they were not entirely frivolous.") Thus, as to three of the twelve time-barred claims, plaintiff propounded one nonfrivolous argument against dismissal.

Fourth, plaintiff contended that all of the claims were timely because the Corzon Claim, which I declined to dismiss on motion, was both (1) timely and (2) an act in furtherance of a continuing fraudulent scheme of which the earlier events were a part. He argued, under a continuing fraud theory (also referred to as the continuing wrong doctrine and analogous to a continuing violation under Title VII or RICO), that all acts in furtherance of that

---

years. In addition, as noted previously, the Sarbanes–Oxley Act also does not change the statute of limitations for suits filed prior to the law's passage and, even if the Act were retroactive, the majority of plaintiff's claims would still be time barred.

**10.** While plaintiff argued that the determination of inquiry notice is a factual one, inappropriate at the motion to dismiss stage, I noted that the law in the Second Circuit is clear that a court can determine, as a matter of law, whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint. *De La Fuente*, 206 F.R.D. at 381, *citing Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).

scheme were timely—even those that would be time barred if viewed as separate and independent acts.

I rejected this argument for two reasons. First, I doubted, on the basis of existing case law, that the continuing fraud doctrine applied to securities fraud cases. *De la Fuente*, 206 F.R.D. 369, 385–86 *citing SEC v. Caserta*, 75 F.Supp.2d 79, 89 (E.D.N.Y.1999) and cases cited therein. Second, I concluded that, even if the continuing fraud doctrine did apply in the context of securities fraud, the one timely claim in plaintiff's complaint bore no relationship to the ten time-barred accounting improprieties, all of which occurred years earlier. *SEC v. Caserta*, 75 F.Supp.2d 79, 89 (E.D.N.Y.1999).

Plaintiff was unable to cite any authority directly supporting the proposition that the continuing fraud doctrine applied in the securities context. Instead, plaintiff cited a Second Circuit decision, *Bingham v. Zolt*, applying a similar theory to a RICO claim. 66 F.3d 553, 560–61 (2d Cir. 1995). Plaintiff also cited a district court case, *SEC v. Caserta*, which discussed the continuing violation doctrine and noted that it was unclear if it applied in securities cases,[11] and two Court of Appeals cases from other circuits which applied similar theories in different types of claims. *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430–31 (10th Cir.1996)(remanding case for district court to determine if continuing wrong doctrine tolled the statute of limitations for plaintiff's common law fraud claims); *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983)(tolling the statute of limitations in a copyright case where there was a continuing infringement). Defendants responded by themselves citing *SEC v. Caserta* for the principle that it is un-

clear if the doctrine applies in the securities litigation context, and citing no cases for the proposition that it did not. Last April, the Second Circuit Court of Appeals had not specifically opined on the subject; as far as I know it has not done so to this day.

However, as I stated in the April 2002 decision, even if I were to accept plaintiff's contention that the continuing fraud doctrine should be applied to securities litigation, plaintiff's claims would still not be timely. Citing *SEC v. Caserta*, a case also cited by both plaintiff and defendants, I noted in that decision that the continuing fraud doctrine only "applies when a violation occurring outside the limitation period is so closely related to other violations which are not time barred as to be viewed as part of the continuing practice for which recovery should be had for all violations." *S.E.C. v. Caserta*, 75 F.Supp.2d at 89, *cited in De La Fuente*, 206 F.R.D. at 386. Because plaintiff did not allege that the Corzon Claim was related to any of the earlier alleged accounting falsifications, I held that, as a matter of law, there was no continuing fraud.

Plaintiff's citation to *Bingham v. Zolt* did not bolster plaintiff's argument. In *Bingham*, the administrator for the estate of singer-songwriter Robert Nesta (Bob) Marley filed suit against Marley's former legal and financial advisors alleging, among other claims, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). *Bingham*, 66 F.3d at 556; *see also, Bingham*, 823 F.Supp. 1126 (S.D.N.Y.1993)(district court decision). The district court ruled that, although the estate had actual knowledge of the wrongful acts more than four years before the

---

11. I note that plaintiff's parenthetical following the citation of *S.E.C. v. Caserta* was disingenuously incomplete in describing the case as "discussing Continuing Wrong Doctrines [sic] applicability to securities litigation."

suit was brought, the RICO claims were not barred by the four year statute of limitations because all of the RICO *damages* occurred within four years of filing of the suit. *Id* at 558. The district court reached this conclusion by applying the Second Circuit's "separate accrual" rule, under which a new RICO claim accrues, and a new four-year limitations period is triggered, each time a plaintiff discovers, or should have discovered, a new *injury* caused by the predicate RICO violations. *Id.* at 559 (recognizing a circuit split regarding accrual rules and noting that the Second Circuit established a separate accrual rule in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988) *cert denied* 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158.). The Second Circuit concluded that the district court had correctly applied the separate accrual rule, and affirmed the district court's ruling that the RICO claims were not time barred. *Id* at 560–61. The Circuit found that there was a continuing series of fraudulent actions undertaken to divert and conceal assets and income from Marley's estate, and each illegal diversion constituted a new and independent legally cognizable injury to the estate. *Id* at 561. Thus, the court held that "with each diversion a new civil RICO cause of action accrued, with a corresponding four-year limitations period, and plaintiff's action is timely with respect to all diversions occurring within four years of suit." *Id.*

The situation presented in *Bingham* is completely distinguishable from the one here. Even if the court were to apply the RICO separate accrual rule to plaintiff's case, the claims would still be time barred. The separate accrual rule does not make claims that occurred before the relevant statute of limitations period timely; it simply recognizes that injuries that occur *within* the limitations period give rise to new, separate causes of action, which will

themselves be timely. Plaintiff cites *Bingham* to support the statement that "The Continuing Wrong Doctrine dictates that the statute of limitations shall not run until the last act of a continuing fraudulent scheme has been committed." But *Bingham* says no such thing. To the contrary, in *Bingham*, the Second Circuit reiterates that, in this circuit, a "continuing wrong" theory is not recognized. *Bingham*, 66 F.3d at 559 (citing *Banker's Trust Co.*, 859 F.2d at 1102).

Other than *S.E.C. v. Caserta* and *Bingham*, plaintiff cited no other cases from this Circuit to support the statement that the continuing wrong doctrine tolls the statute of limitations until the last act in the scheme has been committed. Plaintiff could have found numerous Second Circuit cases which, unlike *Bingham*, do apply a continuing violation doctrine to toll the statute of limitations. However, the doctrine recognized here, as applied to the facts alleged in plaintiff's complaint, does not prevent plaintiff's claims from being time barred.

The continuing violation doctrine is most often applied in employment discrimination actions. Under the doctrine, if a plaintiff has timely claims resulting from an ongoing policy or practice of discrimination, claims arising out of all incidents of discrimination that result from that policy or practice will be timely, even incidents that would have been barred by the statute of limitations had they occurred in isolation. *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir.2001). A continuing violation can result from either a specific ongoing policy or from a practice established by specific and related instances of discrimination. But individual acts that are so isolated in time from each other or from the timely allegations as to "break the asserted continuum of discrimination," do not constitute a continuing violation. *Id.* quoting

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998). Thus, "multiple incidents of discrimination, even similar ones, that are not a result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993).

Courts in the Second Circuit have recognized this doctrine in employment-related discrimination cases alleging violations of many different laws, including: Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e to 2000e–17 (*Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999)); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq. ("ADA")(*Id.*); Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq. (*Id.*); Section 1983, 42 US.C.A. § 1983 ("1983")(*Id.*); Age Discrimination in Employment Act of 1967 § 2 et seq., 29 U.S.C.A. § 621 et seq. ("ADEA")(*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir.1997)); and New York State Human Rights Law, N.Y. McKinney's Executive Law § 290 et seq. ("NYSHRL")(*Id.*).[12] In *Lightfoot v. Union Carbide Corp.*, the Second Circuit considered whether an employer's alleged failure to pay an employee at an appropriate salary level was a continuing violation of the ADEA or NYSHRL when, over a period of four years he was repeatedly demoted and his pay grade remained frozen. *Lightfoot*, 110 F.3d at 907. While the plaintiff alleged that these actions were part of an ongoing policy of "victimizing"

older employees, the court concluded that he had presented no evidence to support either a claim of a discriminatory policy or "a connection between his job reassignments and a discriminatory animus." *Id.* The court concluded that a continuing violation was not established, and affirmed the district court's dismissal of the claims as time barred. *Id.* In contrast, in *Harris v. City of New York*, the Second Circuit found that district court had prematurely dismissed plaintiff's claims for denial of promotion, because it was possible that the repeated acts to fail to promote him could be acts in furtherance of a continuing policy. *Harris*, 186 F.3d at 250; *see also Swanston v. Pataki*, 2000 WL 245871 (S.D.N.Y. March 3, 2000)(holding that plaintiff's conclusory allegations were insufficient to state a continuing violation when the incidents alleged involved different conduct by different persons in diverse contexts, which were not repetitive or ongoing in nature, and distinguishing *Harris* because *Harris* plaintiff alleged specific actions that were closely related).

The instant case is clearly analogous to the cases where the continuing violation doctrine was rejected by the courts. While all thirteen of plaintiff's claims allege a type of "fraud," there is no plausible continuing common scheme or plan that connected the plaintiff's time-barred allegations with his one timely allegation, other than "defendants are bad guys." Although plaintiff claimed in its opposition to the motion to dismiss that "DCI defendants' fraud continues to this day," the

---

12. The continuing violations doctrine, long described as disfavored by the Second Circuit has been severely limited by the Supreme Court's holding in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *see also Branch v. Guilderland Central School District*, 239 F.Supp.2d 242, 2003 WL 110245 (N.D.N.Y. Jan.10, 2003)(noting that the recent Supreme Court decision in *Morgan* curtails the use of the continuing violations doctrine, at least in Title VII cases). The plaintiff's claims appear even more frivolous under *Morgan*. However, as plaintiff's opposition to the motion to dismiss was filed on September 28, 2001, I consider the frivolousness of its claim in light of the law on that date.

only concrete timely allegation is the Corzon Claim, which is temporally separate from the time-barred claims and which proceeds on a wholly different theory. It is obvious that no court in this circuit, applying the continuing violation doctrine as described above, would conclude that plaintiff's claims were not time barred because they were part of an ongoing continuing violation.

Courts in this circuit, and in New York state, recognize variations of the continuing violation doctrine in other contexts, but plaintiff's argument is not bolstered by these cases either. In *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir.1992), the Second Circuit noted that federal courts recognize the continuing wrong doctrine in some circumstances where the defendant's conduct causes continuing damages. Based on the theory that it would be impractical or unfair to require the plaintiff to commence an action before he or she can predict the damages, this doctrine provides that a claim accrues each time the plaintiff sustains damages. *Id.* The Second Circuit has applied this doctrine in antitrust cases, following the Supreme Court's holding in *Zenith Radio Corp v. Hazeltine Research, Inc.* that "[i]n the context of a continuing conspiracy to violate the antitrust laws...[usually,] each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and...as to those damages, the statutes of limitations runs from the commission of the act." 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) *quoted in Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 832 (2d Cir.1991). This means that, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.*[13] Under this rule, courts in this circuit will allow a plaintiff to recover for injuries that occur within the four-year statute of limitations period for antitrust actions, even if the underlying antitrust action that caused the injury occurred outside the statute of limitations. *See e.g., Driscoll v. City of New York*, 650 F.Supp. 1522 (S.D.N.Y.1987)(denying defendant's motion to dismiss based on statute of limitations grounds when the underlying antitrust act—a restrictive lease covenant—occurred outside the limitations period, but the plaintiff's cause of action related to a separate injury resulting from the antitrust act denial of an application for docking privileges based on the restrictive lease covenant). This is no different from the separate accrual rule of *Bingham*.

Courts in the Second Circuit recognize another type of continuing wrong doctrine when considering New York state claims. New York law provides that, for certain types of continuing torts, the statute of limitations begins running from the last actionable event. *Shannon v. MTA Metro-North R.R.*, 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (1st Dep't 2000). The Second Circuit applied this doctrine in *Rapf v. Suffolk County of New York*, 755 F.2d 282, 291 (2d Cir.1985) (citations omitted), explaining that under New York law, a continuing tort creates a recurring wrong, and a cause of action accrues from each injury not just from the date the original tort was committed. In *Rapf*, the plaintiffs were suing for damage to their property caused by an alleged failure of

---

**13.** The reasoning of *Zenith Radio* was also the basis of the Second Circuit's establishment of the separate accrual rule in RICO cases in *Banker's Trust. Bankers Trust*, 859 F.2d at 1104 (quoting and applying *Zenith Radio*).

the county to maintain structures intended to stop beach erosion. *Id* at 284. The Second Circuit overruled the district court's dismissal of a case as time barred, holding that the plaintiffs had sufficiently stated a timely cause of action based on a continuing nuisance which was still ongoing at the time they filed their complaint. *Id.* at 292.

Again, it is clear that plaintiff in the instant case would not prevail under this theory, even if it were extended to his allegations. Plaintiff did not allege any timely causes of action that could be characterized as injuries flowing from the time-barred claims. The only timely alleged claim is not even related to, never mind an injury resulting from, the time-barred claims.

In short, even if this Circuit recognized a continuing violation doctrine for securities frauds, the facts alleged in the complaint do not even arguably make one out. The continuing violation or continuing wrong doctrines recognized by this Circuit, if applied to plaintiff's allegations, would not render the time-barred claims actionable. Plaintiff fails to allege any comprehensive theory of a continuing violation underlying both the time-barred and timely claims.

The few cases from other circuits that plaintiff cites do nothing to bolster plaintiff's argument. In *Tiberi v. Cigna*, 89 F.3d 1423 (10th Cir.1996), the Tenth Circuit recognized that New Mexico state law, like New York state law, suspends the statute of limitations for a continuing tort until the date of the last injury. The

plaintiff in *Tiberi* brought various contract and tort claims against defendant after their business relationship ended. *Id.* The Tenth Circuit reversed the district court's dismissal of plaintiff's tort claims, holding that under the continuing wrong doctrine the action could be timely, because the last alleged injurious act occurred within the statute of limitations period. *Id.* at 1430–31. The Tenth Circuit's holding in *Tiberi* is the same as the Second Circuit's holding in *Rapf.* The continuing tort doctrine can toll the statute of limitations to the extent that the plaintiff alleges timely injuries which stem from the underlying tort. Again, plaintiff in the instant case makes no allegations of timely injuries resulting from untimely claims.[14]

*Taylor*, 712 F.2d at 1118—in which the Seventh Circuit extended the concept of a continuing violation to copyright infringement—was expressly rejected by the Second Circuit for that very proposition. *See e.g., Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993). While I suppose one could argue that the Second Circuit might view securities fraud differently than copyright infringement, that argument finds no support in *Taylor.*

Plaintiff has not offered any reasoned basis for assuming that the continuing wrong doctrine would be extended to securities fraud, and he certainly has not suggested any reason why the doctrine would be applicable in this case. The only common thread is plaintiff's claim that defendants are manipulative wrongdoers. That does not make out a continuing violation. I thus conclude that plaintiff's argument that his claims are not time barred be-

---

14. In addition, to the extent that the *Tiberi* court recognized that the continuing tort doctrine applies to situations where the defendant commits continuing fraudulent actions to hide his original fraud, plaintiff's argument is still not supported. While plaintiff claimed that investors issued press releases which

were designed to deceive and confuse investors as to the true condition of the company, I have already determined that, as a matter of law, these releases do not rise to the level of fraudulent concealment. *De La Fuente*, 206 F.R.D. at 383.

cause of the continuing wrong theory is frivolous. *See generally, Day v. Moscow,* 769 F.Supp. 472 (S.D.N.Y.1991)(rejecting plaintiff's contention that his complaint is not time barred under a continuing violation theory as frivolous and a "ploy to resurrect his time-barred claims" when plaintiff alleged "interlocking" events but the facts did not support any reasonable inference of an underlying continuous policy).

$$* \quad * \quad * \quad * \quad * \quad *$$

Plaintiff offered four arguments in the opposition to the motion to dismiss for why its claims should not be dismissed as time barred. As to three of the twelve time-barred claims, one of those four arguments was nonfrivolous. As to the other nine time-barred claims, all four arguments were frivolous. Thus, I find that plaintiff violated Rule 11(b)(2) to the extent of nine of the twelve time-barred claims.

4. *Plaintiff Had An Evidentiary Basis to Maintain the Corzon Claim, and His Rule 56(f) Affidavit Was Not Fraudulently Filed*

██ I now turn now to the one claim that was not dismissed as time barred: the Corzon Claim. Defendants contend that plaintiff knew that there was no evidentiary basis for this claim because they had provided plaintiff with irrefutable evidence that disproved the claim. Again, defendants are presumably arguing that plaintiff violated Rule 11(b)(3).

I deny this aspect of defendant's motion.

As discussed, on January 3, 2002, DCI Defendants moved this court for partial summary judgment with respect to the Corzon Claim. In support, DCI Defendants submitted the Declaration of John J. Adams, President and EO of DCI and an individual defendant, dated December 13, 2001, with attached exhibits ("Adams Declaration"). The affidavit purported to explain why the Corzon stock was not distributed to investors. The attached exhibits were: (1) a press release announcing the stock dividend dated November 27 (obviously from November 27, 2000); (2) a memo from Joseph J. Murphy, Chairman of DCI, to Shari Humphreys at Corporate Stock Transfer Co., dated January 9, 2001, asking for instructions on distributing the Corzon Shares; (3) a memo from Joseph J. Murphy to Karen Lazar at American Stock Transfer, dated January 9, 2001, asking that a list of shareholders of record as of December 6, 2000 be sent to Shari Humphreys, the Corzon stock transfer agent; (4) a Form 8–K current report for DCI, dated January 30, 2001; (5) a Form 8–K current report for Lest Corp., dated January 25, 2001; (6) a letter from Anthony R. Plum, Esq., an attorney from Macer, Brown & Plat, to Jane Flood of US Pained, Inc., dated March 30, 2001, stating that Macer Brown represents Lector (formerly Corzon) and that the Lector common stock issued to DCI was restricted and could not be resold or transferred except pursuant to an effective registration statement or exemption from registration; (7) a letter from Mr. Plum addressed to "Ladies and Gentlemen" at DCI, dated April 4, 2001, explaining that the Lector shares are restricted shares and cannot be resold or transferred; (8) a stock certificate from Lector Corporation certifying that DCI holds 500,000 shares of common stock, dated June 19, 2001. In their "Memorandum in Support of DCI Defendants' Partial Motion [sic] for Summary Judgment," DCI Defendants argued that the Adams Declaration and attached exhibits conclusively established irrefutably that the Corzon Claim was not viable.

On April 23, 2002, while stating that the DCI defendants had made a strong case for summary judgment, I deferred decision until plaintiff had an opportunity to take

discovery. Plaintiff's counsel had submitted an affidavit, pursuant to Fed.R.Civ. Pro. 56(f), setting forth that plaintiff had not been able to examine documents in the possession of DCI Defendants that they believed would support their claim, and that discovery had been stayed pending a decision on the motion to dismiss, as required by the PSLRA. I granted plaintiff's motion for leave to conduct discovery, and I deferred a decision on the summary judgment motion.

Following the April 23, 2002 decision, on May 1, 2002, plaintiff's counsel submitted the first request for production of documents on DCI. DCI responded that "[t]he only relevant documents were those already attached as exhibits to the attached Declaration of John J. Adams." (Declaration of Robert A. Horowitz, July 19, 2002, ¶ 4.). Plaintiff's counsel also requested documents from LecStar and UBS Paine-Webber. Plaintiff received responsive documents from PaineWebbber which, they claim, "clearly indicated that DCI continued to sell Corzon shares after January 25, 2001." (Affidavit of Micahel I. Fistel, Jr., September 18, 2001, submitted as Exhibit H to Plaintiff's Opposition Motion.) Plaintiff's counsel also conducted a document review on June 5, 2002, at the corporate headquarters for LecStar. *Id.*

On July 19, 2002, DCI Defendants moved anew for summary judgment, "based on the same papers they submitted in support of their original motion." ("Memorandum of Law in Support of DCI Defendants' Renewed Motion for Summary Judgment," p. 2.) Both the DCI Defendant's original motion for summary judgment and their renewed motion were based on the argument that the Declaration of John J. Adams, and the documents attached thereto, provided conclusive evidence that disproved the Corzon Claim.

I disagree with the DCI Defendants assertion that the documents provided with the Adams Declaration were dispositive. The Adams Declaration offered a chronology of the events, and the attached documents supported the chronology. However, the evidence reveals that DCI declared a dividend of Corzon stock that ultimately could not be distributed because the stock was restricted and unregistered. It also reveals that defendants sold Corzon stock—shares that were allegedly not needed to pay the stock dividend—following the announcement. It is not at all implausible that, when they announced the dividend, defendants were aware that they would be unable to pay it. Defendants were certainly in a better position to know the status of restrictions on the stock and the expiration date of the registration statement than were investors in the marketplace. Defendants pronounce their explanation "dispositive," and it is indeed dispositive of why they could not make good on their announced stock dividend—doing so would have violated the law. But it hardly disposes of the question of why they announced the dividend in the first place, or how they could sell shares at a time when the registration statement was no longer effective.

I thus find that plaintiff did not violate Rule 11(b)(3) by pursuing the Corzon Claim through discovery.

Neither am I persuaded that plaintiff filed a Rule 56(f) affidavit in bad faith.

### 5. Plaintiff's Denial was Reasonably Based on a Lack of Information

Finally, defendants assert that plaintiff's denial of the factual contentions in DCI Defendants' motion for summary judgment under Fed.R.Civ.P. 56(f) was not reasonably based on a lack of information. Defendants state that "[b]ased on the documentary evidence before them, Plaintiff

could not have had a good faith basis to allege that he expected to uncover facts in discovery that would raise genuine material issues of fact for trial." This assertion is worded in such a way as to state a violation under Rule 11(b)(4), but the analysis is the same as that set forth above. DCI Defendants are again asserting that plaintiff should not have opposed the motion for summary judgment made on January 3, 2002, because the evidence provided to plaintiff regarding the Corzon Claim was so conclusive. For the reasons discussed above, I find that the evidence before plaintiff was not dispositive, and plaintiff counsel's Rule 56(f) affidavit requesting further discovery was proper. I conclude that plaintiff did not violate Rule 11(b)(4).

### C. Plaintiff's Request for Rule 11 Sanctions

Plaintiff cross-moves for Rule 11 Sanctions against defendants and "costs and attorney's fees, in the minimum amount of $2,000.00, for plaintiff counsel's time in having to respond to defendants' frivolous Motion." (Plaintiff's Opposition Memorandum, p. 24.) The cross–motion is denied. For the most part I find merit in defendants' motion. There is nothing "frivolous" in their asking me to make the findings required by the PSLRA.

In addition, I recognize that the PSLRA requires that I make findings regarding compliance of all parties with Rule 11(b) at the end of a securities action under the act. I find that DCI Defendants, S & K Defendants, and their respective counsel complied with Rule 11(b) in this action.

### III. Imposition of Rule 11 Sanctions

#### A. PSLRA Requirements

In addition to requiring mandatory review by the court and the mandatory imposition of sanctions when a violation of Rule 11(b) is found, the PSLRA imposes presumptions in favor of attorney's fees and costs. The relevant section of the PSLRA provides:

(3) Presumption in favor of attorneys' fees and costs

(A) In general

Subject to subparagraphs (B) and (C), for purposes of paragraph (2) [the mandatory sanctions provision], the court shall adopt a presumption that the appropriate sanction-

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

(B) Rebuttal evidence

The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that-

(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or

(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

**(C) Sanctions**

If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

■ The mandatory sanctions requirements of the PSLRA were intended "not only to deter ... abusive lawsuits, but also to compensate fully victims of this kind of abusive litigation." *Gurary v. Nu–Tech Bio–Med, Inc.,* 303 F.3d 212, 215 (2d Cir. 2002).

■ Recently, in *Gurary,* the Second Circuit summarized the proper approach for a district court determining if Rule 11 sanctions are appropriate in a PSLRA action:

[I]n cases of this sort, the district court must first determine whether frivolous claims in violation of Rule 11 have been brought. If they have, the court must examine whether nonfrivolous claims have been joined and, if so, whether these claims—whatever their number— are of a quality sufficient to make the suit as a whole nonabusive and the Rule 11 violation not substantial. If no such weighty nonfrivolous claims are attached, the statutory presumption applies. The court must then determine whether the violation was de minimis, for, if it was, the presumption is rebutted...Alternatively, financial statements or other relevant evidence may establish that the full sanction award unjustly creates an unreasonable burden on the sanctioned party and that a partial award would not "impose a greater burden on the party in whose favor sanctions are to be imposed." § 78u–4(c)(3)(B)(i) In this situation, too, the presumption is rebutted and *full* sanc-

tions are not warranted. (emphasis in original)

**B. Application of Sanction Requirements**

I have concluded that plaintiff violated Rule 11(b)(2) by (1) bringing, and (2) making frivolous arguments against dismissal of nine of the twelve dismissed claims.

I do not find that the individuals within the de la Fuente Group violated Rule 11(b)(2). It was plaintiff's counsel's responsibility to make a reasonable inquiry into the relevant statute of limitations -and they received numerous warnings from defendant's counsel that the statute of limitations might be a dispositive issue in this case. The claim were not so defective on its face that the lay individuals in the plaintiff class should have recognized that they were frivolous or could be dismissed on a technicality. Indeed, lay plaintiffs could easily have been mislead about the viability of the claims since many of them had been the subject of SEC action. It was counsel's duty to investigate and apply the appropriate law and to determine whether the claims were warranted by existing law or nonfrivolous arguments. *See generally, Maduakolam v. Columbia University,* 866 F.2d 53, 56 (2d Cir.1989)(declining to impose Rule 11 sanctions on pro se plaintiff whose claim was clearly time barred but where there was nothing in the record to indicate that he knew or should have known this). I find that no competent attorney could have believed that it was appropriate to bring these nine claims. *Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281, 1288 (2d Cir.1986)(remanding to district court for sanctions when it was patently clear that the claims were time barred and no competent attorney could have determined that claims were justified by existing law or nonfrivolous arguments).

■ The fact that plaintiff's counsel violated Rule 11(b) as to nine of thirteen claims raises another issue—what type of sanctions are presumed under the PSLRA when a majority but not all-of the claims in the complaint violate Rule 11? In *Gurary*, the Second Circuit acknowledged that the PSLRA contains statutory ambiguities and gaps regarding the proper handling of complaints that contain both frivolous and nonfrivolous claims. The court stated that "the language of the PSLRA does not make clear whether a complaint containing both frivolous and nonfrivolous allegations triggers the statutory presumption..." *Gurary*, 303 F.3d at 219. After reviewing the legislative history and statutory purpose behind the PSLRA, the court concluded that "once a *substantial* violation is found, the existence of some nonfrivolous claims does not suffice to rebut the statutory presumption on the ground that full sanctions would be an unreasonable and unjust burden." *Id* at 222 (emphasis added). Thus, the mere existence of the four nonfrivolous claims does not rebut the mandatory PSLRA statutory presumption in favor of full costs.

■ Following the approach determined by the Second Circuit in *Gurary*, I now consider whether the violation here was substantial. I conclude that it was.

In *Gurary*, the plaintiff's claim was made up of four claims -two that were frivolous claims and two that, while not legally frivolous, lacked merit. *Id* at 224. The Court concluded that the two "nonfrivolous" claims did not suffice to relieve the complaint from being an unfounded action *as a whole*. *Id.* (emphasis in original). The Court instructed that district courts should "examine the qualitative substance of the nonfrivolous claims in order to assess whether these claims were, in fact legitimate filings that had the potential of prevailing or whether they patently lacked merit and only narrowly avoided being deemed frivolous themselves." *Id* at 222.

Plaintiff's original complaint contained ten claims -all of which were dismissed as time barred. As to seven of these claims, plaintiff made no non-frivolous argument against dismissal. As to the remaining three, plaintiff made only one argument which I determined to be nonfrivolous, and it can be fairly said that this argument "narrowly avoided being deemed frivolous," to use the Second Circuit's language.

Plaintiff's amended complaint added two additional time-barred claims and the Corzon Claim. All of plaintiff's arguments against dismissal were frivolous as to the two additional time-barred claims. The legally nonfrivolous claims do not, by their number or their weight, render the complaint nonabusive. The PSLRA mandatory presumption thus applies.

■ Under the approach delineated in *Gurary*, I must now consider if the violation was *de minimis*—in which case the presumption would be rebutted. In *Gurary*, the Second Circuit recognized that it is unclear what constitutes a "de minimis" violation, and concluded that "it is enough to say that de minimis must mean something different from 'not substantial' "—otherwise the finding of a "substantial" violation would end the inquiry.[15] *Id.* at 223 n. 3. The Second Circuit did not need to define de minimis in *Gurary* because a de minimis finding was "out of the question" in that case. The Court explained that "[t]he legislative history of the PSLRA makes clear that two claims out of

**15.** In my opinion, it *should* end the inquiry. I cannot conceive of a violation that is at once substantial and de minimis. Perhaps Lewis Carroll could, but it seems to me a logical impossibility.

four, without any other possible saving grace, is not enough. The violation in the present case was manifestly not de minimis." It is even more obvious here than it was in *Gurary* that plaintiff counsel's violation of Rule 11 was clearly not de minimis.

Plaintiff's counsel has one other opportunity to rebut the PSLRA presumption that full costs are the appropriate sanction in this case. Plaintiff's counsel can establish that the award of attorneys fees and expenses will impose an unreasonable burden and would be unjust. § 78u–4(c)(3)(B)(i). Obviously, plaintiff's counsel bears the burden of rebutting this presumption. *Gurary*, 303 F.3d at 225. The record before me does not address this issue.

## CONCLUSION

Given the draconian nature of the PSLRA's mandatory sanction, I will allow plaintiff's counsel ten days to provide the court with a letter explaining why the award of attorneys fees and expenses would impose an unreasonable burden and would be unjust. If I require a response to plaintiff's counsel's showing, I will request it.

DCI Defendants claim that their attorney's fees and costs in this action "exceed $70,000." DCI Defendants have ten days to provide the court with precise fee and cost information.

S & K Defendants (DCI's former accounting firm and two individual accountants) joined DCI Defendant's motion requesting sanctions. Seven of the frivolous claims were related to the accounting transactions, and were alleged against both DCI Defendants and S & K Defendants. For the same reasons that the complaint is substantially frivolous as to the DCI Defendants, it is substantially frivolous as to the S & K Defendants. S &

K Defendants also have ten days to provide the court with precise fee and cost information.

Plaintiff was represented by two lead counsel and one liaison counsel in this action. All counsel must submit information regarding their involvement in the case, so that the burden of sanctions can be appropriately apportioned among the firms.

This constitutes the decision and order of this court.